Victorie A. PICARD

v.

BARRY PONTIAC–BUICK, INC. et al.

93–221–A.

Supreme Court of Rhode Island.

Feb. 9, 1995.

Peter M. Cosel, Donato D'Andrea, Newport, for plaintiff.

Lauren E. Jones, Jones Associates, Brenda Coville Harrigan, Gunning, LaFazia & Gnys, Robert S. Thurston, Jones Associates, Providence, for defendant.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on the appeal of Jesse Silvia (defendant) from a judgment against him for assault and battery, for compensatory damages in the amount of $60,346, and for punitive damages in the amount of $6,350, plus interest and

costs. We affirm the judgment in respect to the assault and battery but sustain the defendant's appeal in respect to damages. We vacate the award of damages and remand the case to the Superior Court for a new trial on damages.

## FACTS AND PROCEDURAL HISTORY

This case began eight years ago with a broken signal light. The plaintiff, Victorie A. Picard, brought her mother's car to Barry Pontiac–Buick, Inc. (Barry Pontiac)[1] in Newport, Rhode Island, where the car had been purchased, to have the light repaired. While the car was being repaired, plaintiff decided to have its annual inspection performed as well. The car failed this inspection because, according to a Barry Pontiac representative, the brakes needed to be replaced. The plaintiff brought the car to Kent's Alignment Service (Kent's Alignment), also located in Newport, where the car passed inspection.

The plaintiff then contacted a local television news "troubleshooter" reporter, presumably to report her experience at the two inspection sites. Shortly after Kent's Alignment had inspected plaintiff's car, Barry Pontiac phoned Kent's Alignment to ask that the car be checked again and the sticker removed because the brakes "were bad." Accordingly Edward Kent (Kent), the owner of Kent's Alignment, set January 27, 1987, as the date that plaintiff, accompanied by her goddaughter Kristen Ann Seyster (Seyster), returned with the car to Kent's garage.

Kent's Alignment was divided into a garage area separated by a glass partition from an office area. At the time of the incident at issue in this case, Seyster was in the office, while plaintiff was in the garage. After Kent inspected the car, he told plaintiff that he had been asked to call Barry Pontiac which also wished to inspect the brakes. Ray Stevens (Stevens), the service manager at Barry Pontiac arrived at Kent's Alignment, accompanied by defendant, who was employed by Barry Pontiac.

1. After plaintiff rested, Barry Pontiac moved to dismiss the suit against it pursuant to Rule 41(b)(2) of the Superior Court Rules of Civil Procedure. The trial justice granted the motion, and therefore, Barry Pontiac is not a party to this appeal.

The defendant began to inspect the brakes. He and plaintiff gave vastly different descriptions of what next happened. The plaintiff said she began to take a picture of defendant as he was facing away from her, presumably as evidence for the troubleshooter report. The plaintiff testified that she *did* intend to photograph defendant although the photograph was not intended to identify defendant. The photograph did, however, clearly show defendant fully facing the camera, standing upright while pointing his index finger at plaintiff. After the camera snapped, the events that gave rise to this case occurred.

The plaintiff testified that defendant "lunged" at her and "grabbed [her] around around [*sic*] the shoulders,"[2] although plaintiff did not experience any pain. The plaintiff then testified on cross-examination that after defendant grabbed her by both her shoulders, she and defendant "spun around wrestling." According to plaintiff, defendant released her after someone said, "let her go." The plaintiff then left the garage with her goddaughter.

Seyster and Stevens also testified at trial, and Kent's deposition was admitted into evidence. Seyster, who had remained in the office area, testified that she saw defendant "grab her [plaintiff's] left shoulder and try to get the picture with his other hand," but defendant did not touch either the photograph or the camera. Seyster further testified that defendant had reached for plaintiff with only one arm, not two, and that plaintiff was not spun around, shaken, picked up or thrown against a wall. Stevens testified that he did not see what transpired because his back was turned. He did, however, remember defendant "hollering" that he did not want his picture taken. Kent stated that after plaintiff came out of the office and attempted to photograph defendant, he heard defendant say something such as "don't take my picture." Kent then saw defendant reach for the camera and touch it, but saw no contact between plaintiff and defendant, nor did he see defendant lift plaintiff.

The defendant testified that as he was looking at the car, plaintiff had come up behind him and aimed the camera toward him. He then pointed at plaintiff and said, "who gave you permission to take my picture?" then walked around the car to plaintiff, placed his index finger on the camera and again asked, "who gave you permission to take my picture?" The defendant denied grabbing plaintiff, touching her body, threatening her or making any threatening gestures, scuffling with her or reaching for the photograph. He also testified that he did not intend to cause plaintiff any bodily harm.

The plaintiff testified that although she did not experience any pain immediately after the incident, she did experience numbness in her hips and legs. However, about a week after the incident, plaintiff visited William E. Kenney, M.D. (Kenney) because of "pain radiating down my right leg * * *," pain that reportedly continued periodically up to the time of trial. Kenney examined plaintiff and advised a CAT scan. W.R. Courey, M.D., of St. Anne's Hospital in Fall River, Massachusetts, prepared a radiology report on April 17, 1987, that described "[g]eneralized degenerative bulging of the annulus at [L–3–L–4, L–4–L–5 and L–5–S–1]." Kenney himself saw plaintiff five times in his office between January 30, 1987, and May 26, 1987, each time with a $30 charge.

On April 28, 1987, Kenney wrote a "To Whom it May Concern" letter, in which he stated:

> "This patient had had a ruptured intervertebra disc on the left which was apparent in October or earlier of 1985. She had not complained of her right lower extremity, however, on 1/30/87 she was seen with a history that she had been assaulted on 1/22/87 and had pain in the right lower extremity. The CAT scan taken at St. Anne's Hospital on 4/17/87 reveals nerve root pressure on the right at L5–S1 level.

---

**2.** In a statement describing the incident to the Newport Police, plaintiff stated, "HE GRABBED MY COAT[.] I LUNGED BACKWARD HURTING MY BACK[.]" In a Social Security Administration "Reconsideration Disability Report" dated March 20, 1987, plaintiff stated that she had been "attack [*sic*] by a merchanic [*sic*] from Barry Pontiac" and that she had been "[t]hrown against a wall at Kents [*sic*] garage [.]" The plaintiff testified at trial that, notwithstanding the Disability Report, she had not been thrown against a wall.

Therefore, this change is probably causally related with the assault."

On June 1, 1987, Kenney wrote a second "To Whom it May Concern" letter, stating: "The question has been raised as to whether or not the pain in the right leg is permanent. *The answer is that it is probably not permanent,* but there is no way that I have of knowing for sure whether it is permanent or not." (Emphasis added.) But, twenty-four days later, with no evidence of an intervening examination of plaintiff, Kenney, on June 25, 1987, wrote to plaintiff's attorney:

"It is apparent that the patient sustained a ruptured disc on the right at L5–S1 found by CAT scan on 4/17/87, following an assault on 1/22/87. *The ruptured disc at L5–S1 on the right is a permanent injury.*" (Emphasis added.)

The injured area identified by Kenney was the right L5–S1 region of the spinal column. The defendant introduced into evidence a Newport Hospital Report dated March 26, 1985, which showed a left-sided disc herniation at the L5–S1 locus. The plaintiff confirmed at trial that she had had a history of back problems for at least ten years prior to her encounter with defendant.

On January 6, 1993, some five and one-half years after he last examined plaintiff, Kenney again wrote to plaintiff's counsel and stated:

"To a reasonable degree of medical certainty, in my opinion, the ruptured disc Victorie Picard sustained at L5–S1 was proximately caused by the assault of January 22, 1987. The injury sustained on January 22, 1987, in my opinion, stated with a reasonable degree of medical certainty is permanent in nature."

On January 11, 1993, Kenney swore an affidavit entitled: "Amended Affidavit Under Section 9–17–27 [*sic*] of the Rhode Island General Laws Entitled 'Evidence of Charges for Medical and Hospital Services'" that amended his affidavit of 1987. Attached to the amended affidavit were Kenney's letter of January 6, 1993, the radiology report from St. Anne's Hospital dated April 17, 1987, and the receipts from plaintiff's five visits to Kenney's office. The original affidavit had contained receipts of the office visits, Kenney's

letters of June 25, 1987, June 1, 1987, and April 28, 1987, the radiology report and a letter of May 5, 1987, describing the radiology report.

The amended affidavit stated in part:

"Now comes William E. Kenney, M.D. and makes affidavit under oath and says as follows: * * *

(3) That the attached record of examination of the person examined reflects my true opinion with respect to the diagnosis, prognosis, and proximate cause of the conditions diagnosed.

(4) That to a reasonable degree of medical certainty, the condition detailed in the attached record, related in the history provided by the patient, was the proximate result of the incident which occurred on January 22, 1987."

Other than plaintiff's testimony, these affidavits and their appended records and letters, admitted into evidence by the trial judge, constituted the only medical evidence that documented plaintiff's alleged injury. Kenney was not deposed, nor did he testify at trial.

The plaintiff prevailed at trial and was awarded compensatory damages in the amount of $60,346. Because the trial justice found that defendant's conduct was "sufficiently egrigious [*sic*]," punitive damages in the amount of $6,350 were imposed, for a total judgment of $66,696, plus interest and costs. The defendant appealed the judgment, arguing (1) that plaintiff failed to prove an assault and battery; (2) that plaintiff failed to prove that defendant's actions in fact caused the alleged harm to her; and (3) that the damage awards were grossly excessive and inappropriate as a matter of law.

## STANDARD OF REVIEW

The findings made by a trial justice, sitting without a jury, are accorded great weight. *Raheb v. Lemenski,* 115 R.I. 576, 579, 350 A.2d 397, 399 (1976). These findings will not be disturbed on appeal absent a determination that the trial justice misconceived or overlooked relevant evidence or was otherwise clearly wrong. *Rego Dis-*

*plays, Inc. v. Fournier,* 119 R.I. 469, 473, 379 A.2d 1098, 1100–01 (1977); *Barattini v. McGovern,* 110 R.I. 360, 362, 292 A.2d 860, 861 (1972).

## ASSAULT AND BATTERY

The defendant contended that plaintiff failed to prove the occurrence of an assault because plaintiff was not placed in reasonable fear of imminent bodily harm. Further, defendant argued that plaintiff failed to prove a battery because the evidence failed to establish that defendant intended to inflict an unconsented touching of plaintiff. We disagree with both contentions.

■ Assault and battery are separate acts, usually arising from the same transaction, each having independent significance. *Proffitt v. Ricci,* 463 A.2d 514, 517 (R.I.1983). "An assault is a physical act of a threatening nature or an offer of corporal injury which puts an individual in reasonable fear of imminent bodily harm." *Id.* It is a plaintiff's apprehension of injury which renders a defendant's act compensable. *Id.; see also* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 10, at 43 (5th ed. 1984) ("[t]he damages recoverable for [assault] are those for the plaintiff's mental disturbance, including fright, humiliation and the like, as well as any physical illness which may result from them"). This apprehension must be the type of fear normally aroused in the mind of a reasonable person. *Keeton et al., supra,* at 44.

■ The plaintiff testified that she was frightened by defendant's actions. A review of the attendant circumstances attests that such a reaction was reasonable. The defendant admitted approaching plaintiff, and the photograph taken that day clearly showed defendant pointing his finger at plaintiff as defendant approached her. Because plaintiff's apprehension of imminent bodily harm was reasonable at that point, plaintiff has established a prima facie case of assault.

We have defined battery as an act that was intended to cause, and in fact did cause, "an offensive contact with or unconsented touching of or trauma upon the body of another,

thereby generally resulting in the consummation of the assault. * * * An intent to injure plaintiff, however, is unnecessary in a situation in which a defendant willfully sets in motion a force that in its ordinary course causes the injury." *Proffitt,* 463 A.2d at 517.

■ In the instant case, defendant contended that a battery did not occur because defendant did not intend to touch or injure plaintiff. Rather, defendant argued, the evidence showed that he intended to touch plaintiff's *camera,* not plaintiff's person, and therefore the contact was insufficient to prove battery. With this contention we must disagree. Even if this court were to accept defendant's characterization of the incident, a battery *had* nonetheless occurred. The defendant failed to prove that his actions on January 22, 1987, were accidental or involuntary. Therefore, defendant's offensive contact with an object attached to or identified with plaintiff's body was sufficient to constitute a battery. As noted in the comments to the Restatement (Second) *Torts* § 18, comment c at 31 (1965):

> "Unpermitted and intentional contacts with anything so connected with the body as to be customarily regarded as part of the other's person and therefore as partaking of its inviolability is actionable as an offensive contact with his person. *There are some things such as clothing or a cane or, indeed, anything directly grasped by the hand which are so intimately connected with one's body as to be universally regarded as part of the person.*" (Emphasis added.)

The defendant's contact with the camera clutched in plaintiff's hand was thus sufficient to constitute a battery. We conclude, therefore, that plaintiff has proven the elements of assault and battery.

## PROOF OF CAUSATION

■ The defendant next asserted that evidence was insufficient to prove that his actions caused plaintiff's condition because the medical evidence submitted by plaintiff was

not competent.[3] We agree.

At the start of trial, defendant objected to the admission of Kenney's January 11, 1993 affidavit which refers to Kenney's opinions to the permanency of plaintiff's condition. The record disclosed that Kenney last examined plaintiff on May 26, 1987, but included no evidence that Kenney examined plaintiff at any time during the ensuing five and one-half year period before executing the affidavit. At the time of trial Kenney had been retired for six years and resided in Massachusetts. It is an impermissible affront to reason to uphold Kenney's affidavit which attested to the cause and permanency of injury in a patient whom he had not treated in five and one-half years and whose medical file he apparently did not consult at the time he signed the affidavit.[4] Furthermore, the material which supported the affidavit was substantively inconsistent. Kenney's 1993 letter stated that the injury to plaintiff was "permanent in nature." However, in support of the 1987 affidavit, shortly after his last examination of plaintiff, he wrote on June 1, 1987, that the injury was "probably not permanent." Yet, twenty-four days later, without reexamining plaintiff, he stated in a letter to *plaintiff's attorney*, that the injury was permanent, a position which he maintained until 1993, though he never reexamined plaintiff in the intervening five and one-half years.

In *Parrillo v. F.W. Woolworth Co.*, 518 A.2d 354, 355 (R.I.1986), this court stated that, "The substitution of a written affidavit for live medical testimony * * * in no way relaxes the minimum requirements for the admission of competent medical testimony." Further, we have noted that, "Although all litigants have the right to take advantage of the provisions of § 9–19–27, they run the risk of a failure of proof unless the medical pic-

ture is sufficiently clear and unambiguous to lend itself to this simplified manner of proof." *Id.* at 356. In the instant case, the conflicting descriptions by Kenney concerning the permanency of plaintiff's injury and the length of time between his examinations and the production of the amended affidavit conclusively demonstrate that the proof was not "clear and unambiguous." *Id.* Our careful review of the record failed to disclose conclusive evidence that plaintiff's alleged injuries were caused by defendant's assault and battery and that such alleged injury was permanent. Indeed, the trial justice stated that "the disability that she [plaintiff] suffers under is per the medical opinion permanent, or at least was at the time of the opinion." The trial justice's apparent doubt as to whether the injury was permanent at the time of trial illustrated further plaintiff's failure to present sufficient medical evidence under this simplified manner of proof. *See Parrillo*, 518 A.2d at 356. We therefore conclude that the medical evidence presented by plaintiff was incompetent to establish that the assault and battery by defendant was the proximate cause of plaintiff's alleged injury.

## DAMAGES

### A. *Compensatory Damages*

■ The defendant next argued that the trial justice's award of compensatory damages in the amount of $60,346 was grossly excessive. We agree.

The trial justice based the award of compensatory damages in part on the pain and suffering alleged by plaintiff, whom the trial justice found credible and candid. The trial justice found that the inconsistencies in the testimony of the witnesses presented by plaintiff were "not significant in [the] Court's

3. The affidavit was admitted under G.L.1956 (1985 Reenactment) § 9–19–27, which states in pertinent part:
   "(a) [I]n any proceeding commenced in any court * * *, an itemized bill and reports, including hospital medical records, relating to medical * * * services * * * and/or any report of any examination of said injured person, including, but not limited to, hospital medical records subscribed and sworn to * * * by the physician * * * shall be admissible as evidence of * * * the necessity of such services or treat-

ment, the diagnosis of said physician * * *, the prognosis of such physician * * * the opinion of such physician * * * as to proximate cause of the condition so diagnosed, the opinion of such physician * * * as to disability or incapacity, if any, proximately resulting from the condition so diagnosed * * *."

4. Counsel for Barry Pontiac reported at trial that Kenney had retired six years earlier and had sent his medical records to "dead files."

mind." Such a conclusion, however, ignored the contradictions between the witnesses' testimony and the internal inconsistencies of plaintiff's own testimony. Indeed, our review of the record revealed that plaintiff's testimony was remarkably malleable.[5] The plaintiff transformed a slight touching (as it was characterized by all witnesses except plaintiff) into a major assault and battery.

In addition to the inconsistencies in plaintiff's testimony concerning the event, plaintiff's testimony in respect to her pain and suffering was not credible, given her medical disabilities that predated the alleged additional injury that she claimed to have sustained as a result of the assault and battery. The trial justice was clearly wrong in relying on plaintiff's testimony concerning her pain and suffering absent additional evidence to establish the specific pain and suffering that developed from this contact with defendant.

■ This court will not disturb an award for pain and suffering unless the award " 'shocks the conscience' or is grossly excessive." *Proffitt*, 463 A.2d at 519 (citing *Bruno v. Caianiello*, 121 R.I. 913, 917, 404 A.2d 62, 65 (1979)). Given the absence of competent medical evidence of causation and given that plaintiff's testimony concerning the assault and her subsequent injuries was not credible, the award of $60,346 in compensatory damages was clearly excessive and out of all proportion to the alleged injury. Consequently, we vacate the award.

### B. *Punitive Damages*

■ The defendant also argued that punitive damages should not have been awarded because the trial justice did not find that defendant acted with malice or in bad faith as directed by *Palmisano v. Toth*, 624

A.2d 314, 318 (R.I.1993). Disfavored in the law, an award of punitive damages is an extraordinary sanction permitted only with great caution and within narrow limits. *Id.* In the instant case there was no proof of malice or bad faith nor was there a finding that defendant acted with malice. Consequently, the award of punitive damages in this case was not consistent with the purpose of such damages, namely, the deterrence of a defendant's "willfulness, recklessness or wickedness," because evidence of these factors was not presented. *Id.* (quoting *Sherman v. McDermott*, 114 R.I. 107, 109, 329 A.2d 195, 196 (1974)).

In conclusion, we deny in part and sustain in part the defendant's appeal. We affirm the judgment of the Superior Court in respect to the defendant's commission of assault and battery, but we vacate the awards of compensatory and punitive damages. We remand the case to the Superior Court for a new trial on the damages sustained by the plaintiff.

---

**5.** The following exchanges between plaintiff and defense counsel illustrate the nature of plaintiff's testimony:

"Q   So it's possible that you told Dr. Kenney that you were shaken by the assailant?

"A   Well, I was shaken, but maybe not in the terms—but I was shook up. That's it. You know what I mean. I was shook up mentally. I was ascared [*sic*]."

and again,

"Q   Are you claiming that he [Silvia] physically picked you up and swung you around?

"A   Well, my feet wasn't hitting the floor. * * *.

"Q   So in addition to Mr. Silvia grabbing you by the shoulders he physically lifted you off the ground, is that correct?

"A   I can't say for sure because I felt dizzy. The room was spinning. So I felt like I was off the floor, but I don't know because I was just moving around fast."