Ronald OUELLETTE et al.

v.

Bruce L. FILIPPONE.

No. 98–403–Appeal.

Supreme Court of Rhode Island.

Feb. 11, 2000.

R. Pelletier, for Plaintiff.

Roger Ross, for Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

PER CURIAM.

In this appeal, Ronald and Barbara Ouellette (collectively, the plaintiffs) appeal from the entry of final judgment denying their claim to recover a real estate purchase deposit from Bruce L. Filippone, the defendant, and from an award of damages to Filippone on his counterclaim alleging a breach of the real estate purchase contract.

In their appeal, the plaintiffs contend that the trial justice was clearly wrong in concluding that their failure to resolve an existing record of a real estate foreclosure of property owned by them, that had occurred prior to the time the instant purchase and sale agreement was signed and which automatically precluded them from

obtaining a loan, served to indicate a lack of good faith and due diligence on their part. They also assert that because the trial justice, in his decision, did not specifically address the defendant's counterclaim, and because he failed to make any findings of either fraud or failure on their part to perform a specific contractual obligation, the defendant's damages should have been limited only to his retention of the deposit. Finally, the plaintiffs maintain that application of the statutory rate of interest unfairly penalizes them because they at no time benefited from the deposit money during the pendency of the controversy.

We ordered the parties to appear and show cause why the issues raised in the plaintiffs' appeal should not be summarily decided. After hearing their oral arguments and reviewing their respective memoranda, we conclude that no cause has been shown and we proceed at this time to summarily decide the issues.

On June 15, 1993, the plaintiffs attended an open house at the defendant's home held for purposes of its proposed sale.[1] They made an offer to purchase the property for $166,500. The plaintiffs gave the defendant an initial deposit of $300, and the parties agreed to obtain counsel to facilitate and formalize the transaction. There were no real estate brokers involved in the proposed sale of the property.

In January 1993, plaintiff Ronald Ouellette applied for and received a credit report indicating that, although paid in full at the time of the report, a previous real estate mortgage by him had been delinquent for 180 days in September 1991. At trial, Ouellette testified that in 1991, Heritage Bank for Savings (Heritage Bank) had foreclosed on the particular mortgage to which the credit report referred. The credit report also indicated that one of Ouellette's credit card accounts had been delinquent for a period of ninety days.

On June 14, 1993, the day before actually attending the open house and viewing the defendant's property, the plaintiffs had filed a loan application with Park Square Credit Union (Park Square). That application was denied several days later because Park Square was unable to verify the outstanding mortgage deficiency balance, if any, that remained from the earlier Heritage Bank foreclosure. Ouellette testified that a Park Square officer had told him and his wife that they would have to take care of the foreclosure matter before it would consider granting them a mortgage.

Subsequently, on July 6, 1993, the plaintiffs nonetheless signed the purchase and sale agreement to purchase the defendant's house. The agreement had been negotiated by their respective and former attorneys. The plaintiffs then paid an additional purchase deposit of $8,075. Pursuant to the purchase and sale agreement, a mortgage contingency clause stated:

> "In order to help finance the acquisition of the Premises, Buyers shall apply to a home mortgage loan lender for a home mortgage loan in the amount of $_____ at an interest not to exceed current available rates for fixed mortgage loans. *If, despite Buyers' diligent efforts to obtain such a loan commitment, they are unable to do so by August 1, 1993, Buyers may terminate this Agreement by written notice to Seller postmarked no later than one (1) business day after the expiration of such date,* whereupon all deposits made hereunder shall be refunded forthwith and this instrument shall be voided and without recourse to either party. *Buyers shall also send a copy of the mortgage commitment letter to Seller, or a denial thereof.*" (Emphasis added).

At trial, Ouellette testified that, in the four to six weeks following the June 14, 1993, Park Square loan application, he had attempted to seek financing from three other financial institutions.[2] Not surpris-

---

1. Before trial, the parties stipulated to many of the facts herein recited.

2. At no time did the plaintiffs provide written documentation of these applications to the

ingly, those financial institutions also denied the applications for reasons similar to those given by Park Square. Each institution informed Ouellette that he would have to clear up the Heritage Bank foreclosure matter before it would consider his application. Ouellette admitted that thereafter, he never attempted to investigate or to resolve the problems related to the Heritage Bank foreclosure.

At trial, former counsel for the plaintiffs, Richard Kyte, Jr., testified that he had attempted to discover the status of the Heritage foreclosure, but because Heritage Bank had been a victim of the recent state banking crisis, and had since been succeeded by another bank, he was unable to "gather any information to intelligently advise my client as to what the status of this loan was." On June 29, 1993, Kyte wrote to the defendant's former counsel and informed him of the difficulties that his clients were experiencing in obtaining a mortgage commitment. He requested an extension of the plaintiffs' mortgage contingency deadline. It is undisputed that the defendant agreed to extend the deadline from August 1, 1993, to September 1, 1993. At trial, Ouellette admitted, however, that he did not file any additional loan applications during this extension period.

In late August 1993, Kyte contacted the defendant's former attorney and informed him that the plaintiffs would be unable to meet the extended September 1, 1993, mortgage contingency deadline. On September 9, 1993, Kyte submitted a written request for the refund of the plaintiffs' deposit. Included with the request was a copy of the notice of mortgage rejection from Park Square. The rejection notice was dated September 7, 1993. Subsequent efforts to resolve the deposit or purchase and sale impasse proved fruitless. On November 11, 1993, the defendant put his property back on the open real estate market and, on March 21, 1994, the property was sold for $160,000. The defendant was required to pay a commission of $4,800 to his real estate broker.

After trial and reviewing the evidence, the trial justice denied the plaintiffs' claim. He concluded that the plaintiffs had neglected to comply with the express provisions of the purchase and sale agreement. He found that they had failed to exercise due diligence in obtaining a mortgage loan commitment, as required by the agreement, in order to be entitled to a return of their deposit. The trial justice then, after consideration of the defendant's counterclaim, entered a final judgment of $11,300 in favor of the defendant.

In reaching his decision, the trial justice acknowledged that, although there had been verbal communications between the parties concerning the plaintiffs' inability to obtain mortgage financing, nevertheless:

"whatever the contact between the parties or their counsel, it appears that the explicit conditions of deposit return and voiding of contract was not met by the plaintiff buyer.

"In addition, the Court is not persuaded that the plaintiff buyer exercised due diligence in the pursuit of financing by not making any attempt at clearing up his credit history, the credit history that he found out relative to the Heritage Bank in a timely fashion. Without doing so, his contacting of three other lending institutions were acts of futility, in the Court's view.

"The Court, therefore finds that the plaintiff buyer did not act within—with due diligence in seeking financing, and that they, the plaintiffs, did not comply with the express provisions of the agreement which spelled out a specific manner and time within which to seek the return of their deposit.

"The September 9, 1993 letter with its enclosure was too little too late."

defendant, and at trial, Ouellette admitted that they never made any formal applications

for mortgage financing to these institutions.

We again reiterate that "our review of the findings of a trial justice in a nonjury trial is extremely deferential and that those findings will not be disturbed unless they are clearly wrong or unless material evidence has been misconceived or overlooked." *Marra v. H & H Products, Inc.,* 723 A.2d 803, 804 (R.I.1998) (order) (citing *Epstein v. Dimeo,* 694 A.2d 30, 32 (R.I. 1997), and *Picard v. Barry Pontiac–Buick, Inc.,* 654 A.2d 690, 693 (R.I.1995)). *See also State v. Gasparico,* 694 A.2d 1204, 1208 (R.I.1997); *Rowland Family Trust v. Pelletier,* 673 A.2d 1081, 1083 (R.I.1996); *State v. McKone,* 673 A.2d 1068, 1075 (R.I. 1996).

The trial justice in this case had before him ample evidence to support his finding that the plaintiffs had failed to act with due diligence in obtaining a purchase money mortgage and that they had thereby breached the specific terms of the purchase and sale agreement. He found that even before the plaintiffs signed the agreement, they were aware that Ouellette's credit history was questionable and knew that the earlier Heritage Bank foreclosure constituted an impediment to their ability to obtain a mortgage loan from Park Square. The purchase and sale agreement clearly indicated that time was of the essence, and it established a clear, precise and mandatory procedure to be followed for the plaintiffs to have their deposit returned. In attempting to comply with that provision, the plaintiffs had requested, and had been granted, an extension of the time required to obtain the purchase funds without ever informing the defendant about the earlier Heritage Bank foreclosure problem. They then simply neglected and failed to make any further applications for mortgage financing and failed to comply with the specific contract procedure required to be undertaken at the conclusion of the extension. At trial, Ouellette admitted that he never made any attempt to investigate and resolve the foreclosure problem, even though he was aware that resolving the problem was a known condition to his being able to obtain a loan from as many as four lending institutions.

In light of this evidence, we conclude that the trial justice was not clearly wrong in finding that the plaintiffs had failed to exercise due diligence in attempting to comply with the terms of purchase and sale agreement and that they had breached the express provisions of that agreement.

The plaintiffs' contention that the trial justice did not specifically address the defendant's counterclaim in his decision, and that it was not clear with respect to the damages awarded, is not supported by the record. In assessing the defendant's damages, the trial justice stated:

> "The evidence indicates that on November 11, 1993, the defendant put his property on the market, and in * * * 1994 sold it for $160,000, paying from that amount a real estate commission of $4,800. The defendant, in effect, incurred a loss of some $11,000 from September 1, 1993 to March of 1994. This loss is to be attributed to plaintiff buyer * * *.
>
> So, it cannot be said under the circumstances that the retention of the deposit by the defendant in any way can be considered [unjust] enrichment, because it's clear that the defendant * * * did incur a loss * * * as a result of the plaintiff buyer's lack of candor and actions in not following the terms of the contract."

The record is clear in pointing out that the that plaintiffs agreed to pay $166,500 for the defendant's property; consequently, when the defendant later sold the property for $160,000, he suffered a loss of $6,500. Furthermore, he incurred an additional expense of $4,800 that he was required to pay as the real estate broker's commission. Consequently, the losses suffered by the defendant as a result of the plaintiffs' breach totaled $11,300. Not coincidentally, this is the precise amount that the trial justice found to be the dam-

ages owed to the defendant as the result of their breach of the contract.

With respect to the defendant's counterclaim, we conclude that the trial justice's findings of fact and his decision are supported by the stipulated facts and by the credible evidence introduced at trial.

■ Finally, the plaintiffs maintain that application of the statutory rate of interest to the defendant's award would unfairly penalize them because they never had the opportunity to enjoy the benefits of the deposit money during the pendency of the controversy. Essentially, the plaintiffs are suggesting that the defendant lost his right to any prejudgment statutory interest when he failed to release the deposit immediately upon the plaintiffs' filing of the complaint. This contention has no merit.

■ When a contract does not provide for payment of interest, the clerk shall apply the statutory rate of interest to an award for damages. *See* G.L.1956 § 9–21–10; *North Smithfield Teachers Association v. North Smithfield School Committee*, 461 A.2d 930, 934 (R.I.1983). This is equally applicable to contracts for the sale of land. *See Jolicoeur Furniture Co. v. Baldelli*, 653 A.2d 740, 755 (R.I.) *cert. denied* 516 U.S. 964, 116 S.Ct. 417, 133 L.Ed.2d 335 (1995) (allowing prejudgment interest on award of damages for breach of contract for sale of land).

We are satisfied from the record before us that the trial justice did not overlook or misconceive the trial evidence, nor was he otherwise clearly wrong in finding against the plaintiffs and in favor of the defendant on his counterclaim. Accordingly, for all the foregoing reasons, the plaintiffs' appeal is denied and the judgment appealed from is affirmed. The papers in this case are remanded to the Superior Court.