DECISION
Following jury trial before Mr. Justice Needham in March of 2000, this Court, sitting without a jury, heard these consolidated actions by plaintiffs Eugene Lee and Edward Lee against defendants the Rhode Island Catholic Orphanage Asylum d/b/a St. Aloysius Home and the State of Rhode Island Department of Children, Youth and Their Families alleging, respectively, negligence, assault and battery, intentional infliction of emotional distress, and violation of 42 U.S.C. § 1983, and negligence. Jurisdiction is pursuant to G.L. 1956 § 8-2-14.
 Facts/Travel
Procedurally, during jury trial of this matter, at the conclusion of the plaintiff's case and upon motion of the defendants, Associate Justice Needham entered judgment as a matter of law on some, and dismissed, as duplicative, other of the plaintiffs' claims against St. Aloysius. Counts dismissed as duplicative included 42 U.S.C. § 1983 (counts II and III) and negligence (counts V and XIV); judgment as a matter of law entered in favor of St. Aloysius and against Eugene with respect to negligent hiring, supervision and retention (count VII), violation of the Constitution of Rhode Island (count XII), and breach of contract (count XIII). The loss of consortium count was dismissed by stipulation (count XV). Similarly, judgment as a matter of law entered in favor of St. Aloysius and against plaintiff Edward with respect to the following:42 U.S.C. § 1983 (counts I, II and III), negligence (count V), negligent hiring, supervision, and retention (count VII), assault and battery (count X), violation of Constitution of Rhode Island (count XII), breach of contract (count XIII), and negligence (count XIV). At the same time, judgment as a matter of law entered in favor of St. Aloysius and against all John/Jane Does in both matters. However, Justice Needham died prior to completion of the trial. Pursuant to Rule 63 of the Superior Court Rules of Civil Procedure, the case was assigned to this Court. The parties then stipulated their consent to complete the trial before this Court sitting without a jury.
Consequently, the remaining counts alleged by Eugene against St. Aloysius are negligence (count IX), assault and battery (count X), intentional infliction of emotional distress (count XI), and42 U.S.C. § 1983 (count I). The sole count surviving in Edward Lee's complaint against St. Aloysius alleges negligence (count IX). Regarding the defendant DCYF, each plaintiff's negligence count (count IV) remains. This Court held a jury-waived trial over several days in early November of 2000. At the close of all the evidence, the defendants renewed their motions for judgment as a matter of law on which the Court reserved decision. Subsequently, the parties filed post-trial memoranda. The Court proceeds to state its findings of fact and conclusions of law thereon. Super. R. Civ. P. 52; see also Pillar Property Management, L.L.C. v. Caste's Inc., 714 A.2d 619 (R.I. 1998) (order).
In these matters, the plaintiffs, Eugene Lee (Eugene) and Edward Lee (Edward), are individuals who, as children, formerly resided at the St. Aloysius Home, a foster-care and treatment facility for boys between the ages of five and fifteen. St. Aloysius Home, a nonprofit corporation organized pursuant to a special enactment of the General Assembly, was operated by the defendant Rhode Island Catholic Orphan Asylum Corporation d/b/a/ St. Aloysius Home (St. Aloysius) until it closed in or about January 1994. See Doe v. Gelineau, 732 A.2d 43, 45-46 (R.I. 1999). Under various contracts with DCYF, St. Aloysius had agreed to provide emergency shelter, residential and foster-care services. Id. The subject complaints allege physical, emotional and/or sexual abuse of the plaintiffs by certain St. Aloysius employees while the plaintiffs were residents of the facility. At the time of the alleged misconduct, the plaintiffs were in the care and custody of the State of Rhode Island Department of Children, Youth, and Families (State or DCYF). The defendant DCYF had placed the plaintiffs, then ages nine and ten respectively, at St. Aloysius where they resided from October 1990 to April 1993.
Plaintiff Eugene, the child of Diane Lee and Edward Young, was born on September 21, 1981.[1] Eugene's medical records reflect that during his early years, he presented with lead paint intoxication, punctured ear drums, and numerous scars on his torso. His brother, plaintiff Edward, of the same parents, was born on April 10, 1980.
The uncontroverted evidence indicates that the boys' mother, Diane Lee, was alcohol and drug dependent for a significant period of her life. Her history reflects cocaine and heroin addiction as well as use of hallucinogens and THC. She was characterized as a prostitute. Her psychiatric conditions included depression and schizophrenia. Although diagnosed as HIV positive, she declined medical treatment with the prescription drug called AZT. Similarly, her mother, the boys' maternal grandmother, had exhibited depressive tendencies prior to her death at age 42 from AIDS-related complications, apparently resulting from drug abuse.
The boys' father was not significantly present during much of their childhood. Edward Young, convicted of armed robbery in 1986, was imprisoned until 1990. In addition, he was charged with manslaughter for the alleged starvation death of his son, Travis Stewart.
Evidence of the compromised family situation surfaced early in Eugene's public school records. He attended four different kindergartens during his first year of formal education. During first grade, the school staff described him as "not a well-adjusted child" who did not relate well to others, was often unresponsive, had limited communication skills, varied attention span, poor self image and probable social-emotional difficulties characterized by anger, aggression and withdrawal. He demonstrated frustration, poor motor coordination and poor personal hygiene. During one term, he was absent twenty-six times and tardy thirty times. For prolonged periods of time, he attended school without his eyeglasses, which apparently rendered him essentially sightless. He fell asleep on many occasions, and for significant periods, either exhibited a rocking motion or rested his head on his desk. A psychological evaluation on November 17, 1988 by James G. Clancy, Ed.M. (Clancy report) noted in part:
 "achievement results were all well below expectational levels. He will be unable to compete effectively with age mates in regular classes. He would require a program where individualization would be offered for his learning weaknesses as well as for basic skill acquisition. There were no indications of any significant psychopathology. . . . There was much evidence of social-emotional conflict. Therapy/counseling would be advised to deal with the issues described in this report. Gene may be developing a `failure identity' which needs to be addressed before this complicates an already complicated learning style. . . ." P. Post-trial Mem., Ex. B.
Although DCYF initially had investigated the Lee family in 1984 as a result of an anonymous report concerning the boys' being neglected and the mother's alleged prostitution and drug abuse, DCYF closed the file after providing some interventions. Subsequently, DCYF re-opened the case on October, 25, 1990, upon receiving from the local school department a complaint that Eugene and Edward were not adequately nourished, in poor hygiene, and without parental supervision. Their mother had been the custodial parent, and their father had seen them rarely. At that time, DCYF removed the boys and placed them at St. Aloysius. Thereafter, the Family Court granted temporary custody to DCYF upon its petition alleging neglect and after a finding of dependency[2] based on an admission of dependency by the boys' mother. Pursuant to subsequent hearings, the boys remained in DCYF's custody and resided at St. Aloysius. When Edward Young, the boys' father, was charged with the death of his son, Travis Stewart, DCYF requested, and the Family Court issued, a restraining order preventing the boys' father from contacting them.
A psychological evaluation, prepared for St. Aloysius by John J. Laffey, Ph.D. and conducted on December 13, 1990, described Eugene as a well-motivated, rather serious and quiet youngster who appeared "more constricted, inhibited, distressed and dysphoric than his brother." P. Post-trial Mem., Ex. C. The psychologist observed a combination of anxiety and depression with the depression being related to the loss of significant others, specifically mother.
In April of 1991, Leanne Cuomo (Cuomo) became the boys' DCYF caseworker. On May 28, 1991, Cuomo first learned that Eugene had been sexually abused by Anthony Harrison (Harrison), his mother's male friend. The information came from Arlene Lyons of the Department of Social Services in Massachusetts (DSS), the Massachusetts agency which is equivalent to DCYF. Cuomo informed the boys' mother that the reunification goal would be compromised by Harrison's presence in the home during the children's home visits. Additionally, she requested that the sexual abuse treatment team at St. Aloysius evaluate Eugene and Edward regarding the need for intervention. Both children were evaluated. Consequently, Eugene began the sexual abuse counseling program at St. Aloysius. Although Edward did not present with a sexual abuse history, he also received counseling services at St. Aloysius.
During these interventions at St. Aloysius, Eugene revealed that Harrison had performed oral sex on him while he was in bed at home. Over the course of the sexual abuse evaluation from July 26, 1991 to September 13, 1991, Eugene repeatedly reported nightmares about Harrison. Additionally, Eugene, who also had been beaten with a leather strap by Harrison, related that he had witnessed Harrison strike his mother. Similarly, his brother Edward had been beaten with the strap. Eugene indicated that his mother also had beaten him with a strap. He related a frightening situation involving his hiding under the bed when the police had entered his home to evict the family. He mentioned that his mother's alcohol and drug use bothered him because "sometimes she wouldn't take care of us right." P. Post-trial Mem., Ex. P. The abuse evaluator noted in part that:
 "Most of Eugene's experiences prior to his placement at SAH included caretakers who have been `out of control.' . . . Eugene is a very compliant, conforming, inhibited youngster who continues to be at risk for sexual victimization. . . .
 Unless Eugene is given the opportunity to explore his feelings . . . he will likely become withdrawn and isolated or act out his rage. . . . Eugene has been the victim of physical and sexual abuse, parental substance abuse, and neglect. Despite having experienced many traumatic events, Eugene is a sensitive, caring youngster who maintains positive relationships with both peers and adults. He is a very likable child whose needs may not be attended to as quickly as a child who acts out. . . . In summary, Eugene has taken on the role of the `hero' child within his very chaotic family. He has many strengths. However, these strengths may be prohibiting him from getting his needs met in healthy ways." P. Post-trial Mem., Ex. P.
The evaluator's recommendation for ongoing counseling was followed by St. Aloysius. During treatment, Eugene reported other sexual activity that had occurred prior to his placement at St. Aloysius, including (i) at age eight, sexual intercourse with his eight-year-old female cousin and repeated incidents of oral sex with his seventeen year old male cousin and (ii) at age ten, sexual intercourse with his girlfriend. While at St. Aloysius, Eugene revealed additional sexual experiences with other family members or friends to Walter Burke (Burke), a supervisor at St. Aloysius. In addition to addressing sexual abuse, Eugene's therapy at St. Aloysius also included substance abuse and physical abuse counseling.
Cuomo and St. Aloysius worker Donna Carr (Carr) were concerned that Harrison was present in the mother's home during the boys' visits. When the boys' mother admitted to Cuomo that Harrison was present during the boys' home visits, Coumo restated that his presence in the home would jeopardize the goal of family reunification. In particular, on December 6, 1991, Harrison answered the telephone when Cuomo called the boys' mother. Shortly thereafter, at a Family Court hearing on December 12, 1991, DCYF opposed reunification because of Harrison's presence in the home. At that time, the Court ordered that Harrison not be present during the boys' home visitation. Consequently, the boys were upset about their inability to return home.
The incident giving rise to Eugene's claims herein occurred in mid-December of 1991. While at St. Aloysius, a supervisor, Joseph Leeder (Leeder), inappropriately touched Eugene. The assault which lasted for approximately one to two minutes involved Leeder's finger contacting the area above Eugene's genitals while he was fully clothed and sitting on Leeder's lap (Leeder incident). Eugene reported the incident when questioned a few weeks later by Burke, who was investigating allegations by other boys that Leeder had inappropriately touched them. At that time, Eugene acknowledged the event and stated that he did not wish to get Leeder in trouble. Subsequently, Eugene related the incident to state investigators and other involved clinical workers.
On January 8, 1992, DCYF worker Cuomo first learned of the Leeder incident from Carr and Child Abuse and Neglect Tracking System (CANTS) investigator Ray Heroux. Prior to that, Cuomo had no inkling that Leeder, an employee of St. Aloysius, might molest Eugene or others. By letter, St. Aloysius informed DCYF that Eugene was continuing sexual abuse and individual treatment at St. Aloysius and that Leeder had been immediately terminated. Cuomo also had been advised that St. Aloysius had triggered investigations regarding the prior sexual experiences that Eugene had disclosed during his counseling at St. Aloysius.
During his stay at St. Aloysius from October, 1990 to April 1993, Eugene reportedly thrived. His teacher Denise McMaugh testified that he attended all classes, excelled in peer relations, and demonstrated responsible behavior. Subsequent to the Leeder incident, Eugene's behavior remained constant. According to his teacher and various records, he exhibited no symptoms which could be related to anxiety or stress resulting from the Leeder incident. He was not distractible, irritable or angry toward his peers, nor did he exhibit disruptive behavior or disturbed sleep. During a counseling session in January, 1992, when Carr told Eugene that she knew about the incident, Eugene put his head down on the desk and remained silent. Subsequently, in March of 1992, Eugene was involved in a sexual incident involving another boy at St. Aloysius. From July, 1991 through March, 1993, Eugene participated in ongoing counseling and therapeutic interventions while at St. Aloysius.
Over the period of the boys' placement at St. Aloysius, DCYF pursued the reunification goal. However, despite some progress, the boys' mother experienced several relapses with drug abuse. When she missed counseling appointments and urine screens, the boys' home visits were canceled. Consequently, Eugene and Edward were upset and angry. During this period, the expectation of reunification was crushed by their mother's unresolved drug abuse. Placement of the boys with family members was ruled out after their mother revealed to state workers that her family members had a history of sexual abuse and incest.
In April of 1993, Eugene and Edward were discharged from St. Aloysius to a foster home. Eugene disliked the foster placement and began exhibiting disruptive behaviors, including bedwetting, aggressive acts towards the other children, and the rocking motions similar to those he had demonstrated in public school prior to his placement at St. Aloysius. In mid-1993, pursuant to DCYF's request, psychological evaluations of Eugene and Edward were performed by Bertram Gibbes, Ph.D. of Delta Consultants. The treatment with Dr. Gibbes, involving sexual abuse assessment and psychotherapy regarding reunification, extended over seven sessions from May 3, 1993 through July 16, 1993, some of which occurred conjointly. At the time of these assessments, the boys resided in the foster home placement.
Regarding Eugene, the psychologist documented that after some prodding, he easily established rapport and trust. While remaining forthcoming throughout the sessions, he presented as very compliant, quite eager to please, extremely needy of nurturance, and overly sensitive to rejection. At times, Eugene was very self-centered and he would "shut down" or become "oppositional" when things did not go his way. He presented with "some depressive symptomatology," which diminished as contact with his mother increased. During these sessions, Eugene reported the details of four incidents of sexual molestation, including the Leeder and Harrison incidents. Dr. Gibbes concluded that
 "[D]espite the fact that Eugene has been separate from his mother for a number of years, he is still very strongly bonded to her and sees her as very nurturant. While Eugene did make several disclosures of being sexually molested, all of which are consistent with other reports, he does not present with the symptomatology of someone who has been `traumatized' by these episodes. However, given Eugene's high need for nurturance and eagerness to please, he remains an easy target for sexual molestation. Overall his behavior characteristics do meet the criteria for a diagnosis of . . . Dysthymia." P. Post-trial Mem., Ex. EE.
Regarding Edward, Dr. Gibbes described him as "a tall, husky adolescent . . . [who] remained overly defended around his difficulties and was somewhat wary of me throughout our contact." DCYF Post-trial Mem., Ex. I. Gibbes' psychological assessment of Edward states in part:
 "Edward presents as having low self-esteem around his capabilities and a great deal of difficulty modulating his emotional expressions functionally, particularly sadness (and anger). Thus he often gets very depressed and hopeless and, at these times, has the propensity to act out aggressively. Over the time that I saw him, he did become more optimistic about being reunited with his mother and some of his depressive dispositions seemed to have subsided. . . . [In summary,] [d]espite the fact that Edward has been out of his mother's care for a number of years, he is still very strongly connected to her psychologically and holds many positive nurturant [sic] memories of her. Edward also does not present with the symptomatology of a child who has been the victim of sexual abuse. However, his behavioral characteristics are more in line with a diagnosis of . . . Dysthymia." DCYF Post-trial Mem., Ex. I.
For both boys, Dr. Gibbes recommended reunification with their mother and, if reunited, participation in family therapy. If reunification did not occur, Dr. Gibbes noted that both boys would continue to need supportive psychotherapy.
Finally, in July of 1993, Eugene and Edward were reunited temporarily with their mother who was then living in Massachusetts. Shortly thereafter, the DSS investigated reports of neglect. Eugene apparently had became truant from school because he was required to care for his younger siblings at home. The Rhode Island Family Court ordered that the case be closed on March 10, 1994. In October of 1994, the boy's mother signed over guardianship of all four children, including Eugene, who was then placed with a family friend.
Eugene's life remained tumultuous. He was dismissed from several public schools for reasons including fighting with and threatening a teacher, possession of a knife with the declared intention of utilizing it for assault purposes, and repeatedly attending school under the influence of alcohol and/or marijuana. Eugene had a turbulent course involving charges of sexual assault on a minor female in July, 1997, as well as robbery in September, 1998, convictions, sentencing to the Rhode Island Training School (RITS), and parole violation. During this period, although Eugene participated in some counseling at the RITS, he rejected many other opportunities for counseling, education and employment assistance.
While at the RITS, Eugene was referred for a psychological evaluation in order to assess his mental health status as part of a residential placement process. On February 5, 1999, he was examined by Mark Cameron Dumas, Ph.D. The evaluator reviewed information from several sources; however, he acknowledged that specific information regarding Eugene's history was sparse. Addressing Eugene's psychosocial history, Dr. Dumas noted:
 "Eugene's psychosocial history is characterized by many serious stressors. In addition to the current circumstances surrounding his mother's illness, and the need for placement at this time, Eugene also has a history of being removed from his home and family. More specifically, Eugene has been placed in foster care and residential placements where reportedly he was the victim of abuse, the type and extent, nevertheless, is uncertain. Moreover, as mentioned, complicating his history is his father's incarceration at the ACI. . . . Interviewing revealed that Eugene displays problems associated with depression. Symptoms include sleep disturbance, feelings of hopelessness, irritability and sadness. Reportedly such characteristics have been present for the past few months, secondary to his placement at the RITS, and have exacerbated in frequency and intensity with his mother's health demise and his consequent placement dilemma." P. Post-trial Mem., Ex. HH.
The doctor made several recommendations, including placement in a structured residential facility with access to comprehensive services; in particular, counseling to address his depression "and its most apparent etiology (i.e., his mother's health status)." P. Post-trial Mem., Ex. HH. Upon his release from RITS, the Rhode Island Family Court ordered supervision between DCYF and the Department of Corrections. Eugene was sent to a residential placement, Whitemarsh House; however, ultimately he was discharged for being non-compliant.
Similarly, Edward engaged in antisocial and criminal conduct. First, for carrying a weapon, he was detained at the RITS from September of 1996 until his release in March of 1997. Subsequently, in July of 1997, he was detained at the RITS for felony assault, robbery, and malicious destruction of property. During that period, the boys' mother was convicted and sentenced for possession of cocaine.
In October of 1999, DCYF reported to the Family Court that Eugene resided with his maternal great-aunt, Ana Lee, who was licensed as a foster mother. In its report, the DCYF worker described Eugene as unmotivated and non-compliant with his case plan as well as all services offered to him, including counseling, education and assistance with job placement. At that time, DCYF requested that the case be closed based on Eugene's noncompliance and his having reached age 18.
 Plaintiff Eugene
The plaintiff Eugene contends that the trauma caused by the isolated Leeder incident has resulted, according to his expert witness, in a condition diagnosed as post-traumatic stress disorder (PTSD). The defendant, St. Aloysius, counters that Eugene has failed to satisfy the necessary legal standards for recovery and even if he has, his evidence lacks sufficient credibility to substantiate his claims by the requisite preponderance of evidence. In support of his action, plaintiff Eugene offered testimony, in addition to his own, primarily from four witnesses: (i) Ana Lee, his maternal great-aunt; (ii) Raymond Heroux, a DCYF investigator; (iii) Jessica Shaw, a former employee of St. Aloysius; and (iv) Dr. Steven Feldman, his medical expert.
Eugene's maternal-aunt Ana Lee, claiming familiarity with the Lee family, offered contrasting images of Eugene, who prior to his placement at St. Aloysius was a "regular kid" who "would eat and play and, you know, just do regular family things," as compared to after his discharge from St. Aloysius, when Eugene was quieter, easily angered and prone to fighting with the other children. She was unable, however, to identify either of the two significant male figures in Eugene's life: his father, Edward Young, and his abuser, Harrison.
Next, plaintiff's witness, Raymond Heroux, then-CANTS co-investigator of all of the allegations against Leeder, addressed the CANTS investigation of the Leeder incident and the relevant assessment-of-risk form. The plaintiff relied on Heroux's scoring of "permanent dysfunction" under the category of "Extent of Permanent Harm." When challenged on cross-examination, however, Heroux testified that his score was unjustified. The scoring error on the assessment form was confirmed through the testimony of Steven Theriault (Theriault), then-CANTS co-investigator of Leeder's assaults. The plaintiff also presented Jessica Shaw, a former employee of St. Aloysius (Shaw), who was supervised by Leeder. She conceded that she was romantically involved with Leeder for approximately one year prior to the incident with Eugene. Further, after terminating her employment with St. Aloysius, Shaw adopted a child who was also one of the alleged victims of Leeder at St. Aloysius. She acknowledged her bias regarding this case based on the pendency of her son's action with similar causes of action. Nevertheless, Shaw testified about incidents of Leeder's misconduct with the children at St. Aloysius, including his showing an R-rated movie to the children and walking some of the boys off-campus to a store. However, she did not know if St. Aloysius had taken any disciplinary action against Leeder regarding these incidents. Although Shaw testified that she had observed lap-sitting occurrences, she admitted that she had never expressed concern to her supervisor(s) regarding any child's sitting in Leeder's lap while she was employed by St. Aloysius. Shaw acknowledged that she, like the staff at St. Aloysius, was astonished by the allegations against Leeder. During her testimony, Shaw also suggested that St. Aloysius inappropriately failed to report an instance of child abuse to the State. On closer examination, however, she acknowledged that she had no knowledge as to whether the incident had been reported. Additionally, upon further inquiry, she described the incident as a misunderstanding of her effort to safeguard a boy amidst an altercation between children. Shaw also implied, however, without substantiating testimony or evidence, the existence of some collusion between the State and St. Aloysius regarding avoidance of reportable incidents of abuse.
During his direct examination, Eugene recounted the assault by Leeder in terms entirely consistent with prior accounts of the incident. He also described numerous symptoms which he attributes to the Leeder incident, including difficulty with anger management, impaired ability to express feelings, refusal to participate in physical intimacy, impaired familial relationships, and sleep disturbances. Eugene further testified that he had difficulty trusting counselors. In particular, he was disturbed by the transfer of one of his counselors at St. Aloysius. Nevertheless, he ultimately conceded his refusals to participate in many opportunities for counseling, including for any past abuse or the imminent loss of his mother.
The plaintiff also claims he was victimized during an incident in which another child, while returning from the shower, removed his towel and exposed himself to Eugene (exposure incident). He alleges that the incident occurred when the staff was asleep.
The plaintiff described himself as a "good boy," not involved in any altercations or found truant from school during his stay at St. Aloysius. He recalled the special instruction received for his reading deficit as well as the drug and alcohol free environment at St. Aloysius. Contrastingly, Eugene professed a lack of recall regarding certain other significant experiences in his life. In particular, although he acknowledged expulsions from various schools after reunification with his mother, he was unable to recall the reasons for the expulsions which included fighting, possession of a knife, and intoxication. The plaintiff further testified that he was unable to recall other meaningful events, such as Harrison's abuse of himself or his family members, his own sexual experiences prior to St. Aloysius, and the impact of his mother's deteriorating health on his well-being.
On direct examination, the plaintiff described his recent sexual assault and robbery charges respectively as "kissing a girl when he shouldn't have" and taking a "kid's bike." However, during cross-examination, plaintiff had difficulty recalling that the assault involved a situation of oral sex with an eleven-or twelve-year old female and that the bike incident involved Eugene and four other persons taking a bicycle by force from a juvenile. In particular, Eugene punched the boy in the head before removing his bicycle. Before this Court, Eugene denied that the sexual assault involved any sexual conduct other than a kiss. Likewise, he denied hitting the boy during the robbery.
To establish his claim of PTSD, the plaintiff presented the expert testimony of Dr. Steven Feldman, a psychiatrist. Approximately eight years after the Leeder incident, Dr. Feldman interviewed the plaintiff on two occasions which together totaled approximately an hour-and-one-half. During the first interview, no discussion of sexual abuse issues occurred. Throughout both interviews, Eugene, essentially responding monosyllabically, was less than forthcoming. In pursuit of a diagnosis, Dr. Feldman then read the criteria which have been identified in the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) for PTSD[3] to Eugene for his self-identification of particular symptoms set forth in the criteria such as difficulty falling or staying asleep, irritability or outbursts of anger, difficulty concentrating, hypervigilance or an exaggerated startle response. In this context, Eugene responded affirmatively to most of the elements. Subsequent to the interviews, Dr. Feldman reviewed Eugene's records. He never interviewed Eugene again to address the content of the records or the accuracy of his responses. In addition, he did not contact any family member or other individual to obtain any additional information or verification of Eugene's alleged condition. Dr. Feldman did not listen to the trial testimony of relevant witnesses.
Having reviewed the records, Dr. Feldman compared Eugene's behavior prior to his placement at St. Aloysius with his behavior upon release to the foster home in April of 1993. After review of Well-Baby Clinic records and the Clancy report, Dr. Feldman particularly relied on the latter to characterize Eugene as "quite pleasant and cooperative," well-motivated," and "well-adjusted." For comparison, he relied primarily on the plaintiff's conduct during the foster home placement immediately following Eugene's release from St. Aloysius. Relying on the foster mother's documenting incidents of Eugene's bedwetting, rocking and aggressive behaviors, Dr. Feldman indicated that Eugene was "a very disturbed child." Dr. Feldman opined that Eugene was "shut down," "unable to trust," unable to discuss the Leeder incident, and that he presented symptoms of sexual abuse. These contrasting presentations, Dr. Feldman proffered, established that the Leeder incident was the reason, indeed the proximate cause, of Eugene's behavior at the foster home.
In arriving at his opinion, he did not indicate any integration of the early school records or the Gibbes evaluation or the extensive history of physical and sexual abuse or the documented absence of symptoms or Eugene's ongoing educational progress and responsible behavior at St. Aloysius subsequent to the Leeder incident. In addition, he was unaware of the diagnosed mental illnesses in Eugene's family members, including brother Edward's matching diagnosis (Dysthemia) despite his having had no history of sexual abuse.
As acknowledged by Dr. Feldman, the DSM-IV criteria for PTSD requires that the traumatic event to which the person has been exposed must contain both of the following: (1) the person experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others and (2) the person's response involved intense fear, helplessness, or horror which in children may be expressed by disorganized or agitated behavior. Focusing on the first element, Dr. Feldman conceded that many events in the plaintiff's prior history would qualify as sufficiently traumatic to satisfy the standard. These experiences include Eugene's observing his mother being beaten with a strap by Harrison, the frightening police intrusion into his home, and his mother's life-threatening medical condition. Regarding the second criteria, Dr. Feldman did not counter the dearth of evidence that would satisfy the criteria.
As stated in the DSM-IV, when evaluating for PTSD, an evaluator should rule out malingering as a differential diagnosis in situations in which financial remuneration, benefit eligibility, and/or forensic determinations play a role. DSM-IV at 427. When queried about the differential diagnosis of malingering, Dr. Feldman steadfastly declined to address it until re-cross-examination when he acknowledged that Eugene had exhibited evidence of that condition.
 Defendant's Expert Testimony
The defendant's medical expert, psychiatrist Joseph V. Penn, challenged the basis for the conclusions of the plaintiff's expert, Dr. Feldman. In particular, he opined that many significant factors in Eugene's history prior to his placement at St. Aloysius should have been considered in attempting to causally relate Eugene's alleged damages to an injury. These include emotional and developmental delays, high blood lead level, punctured ear drum, rocking behavior and traumas in the form of circular scars on Eugene's torso. Additionally, he noted the parental neglect, the physical abuse perpetrated upon Eugene by his mother and Harrison, as well as the multiple sexual experiences, including sexual abuse by Harrison. Dr. Penn also found significant several family and social stressors including substance abuse, disruption of home life due to fire and eviction by police, as well as the father's incarceration and the implications related to the mother's HIV diagnosis. In addition, he considered the occurrence of depression in two generations of Eugene's family: his mother and maternal grandmother. Dr. Penn testified that all of these pre-existing traumatizing factors are damaging, thereby making it absolutely unfeasible to consider that Eugene's alleged damages result from the Leeder incident alone.
Dr. Penn also opined that Eugene does not meet the detailed criteria to establish the diagnosis of PTSD. According to Dr. Penn, the Leeder incident did not expose Eugene to a sufficiently traumatic event. Further, Eugene did not exhibit a post-incident reaction to the Leeder incident. The evidence, in his opinion, did not satisfy the DSM-IV criteria that Eugene's response to the incident manifested intense fear, helplessness or horror. Additionally, Eugene did not display any behavioral disturbance(s), intrusive recollections, or recurrent dreams as a result of the Leeder incident. In his opinion, Eugene is more appropriately diagnosed as malingering. He based this opinion on the following facts: (1) Dr. Feldman was consulted in the context of litigation, (2) Eugene was able to recall certain significant events in his life, but not others, (3) Eugene refused many offers for therapeutic interventions, as well as his failure to actively seek treatment, and (4) his testifying less than truthfully regarding his recent criminal charges of assault and robbery.
According to Dr. Penn, based on the evidence, it is impossible to causally relate with reasonable psychiatric certainty, any social impairment, educational deficiency, or current occupational impairment to the Leeder incident. He further opined, contrary to the opinion of the plaintiff's expert, that Eugene has demonstrated the ability to establish rapport and engage in meaningful counseling.
 Eugene's Negligence Count Against St. Aloysius — Count IX
In support of his negligence claim, the plaintiff Eugene argues that based on the Leeder incident, St. Aloysius breached its duty to exercise due care for Eugene's personal safety and physical, as well as emotional, well-being. Further, plaintiff contends that the Court may find negligence based on an alleged breach of contractual or statutory duty by St. Aloysius in conjunction with defendant's testimony regarding the inherent danger of "allowing sexually abused children to sit in the laps of the staff."
To succeed in a negligence action, a plaintiff must prove that (1) the defendant owed him or her a legal duty to refrain from negligent activities, (2) the defendant breached that duty, (3) that said breach proximately caused injury to plaintiff and (4) actual loss or damages resulted therefrom. Splendorio v. Bilray Demolition Co., Inc.,682 A.2d 461, 466 (R.I. 1996). A plaintiff must establish that the defendant had a duty to act or refrain from acting and that there was a causal relation between the act or omission of the defendant and the injury to the plaintiff. Schenck v. Roger Williams General Hospital,119 R.I. 510, 514, 382 A.2d 514, 516-17 (1977) (citation omitted). In particular, a plaintiff must establish a standard of care as well as a defendant's deviation from that standard. Souza v. Chaset, 519 A.2d 1132, 1135 (R.I. 1987). Further, "expert testimony is required to establish deviation from the standard of care when the lack of care is not so evident as to be obvious to a lay person." Richardson v. Fuchs,523 A.2d 445, 450 (R.I 1987). Generally, proximate cause may be established by showing that the harm to the plaintiff would not have occurred but for the defendant's negligence. Schenck, 119 R.I. at 514-515, 382 A.2d at 517 (citation omitted). Moreover, such "causal connection between negligence and a plaintiff's injury must be established by competent evidence and may not be based on conjecture or speculation." McLaughlin v. Moura, 754 A.2d 95, 98 (R.I. 2000) (citing Skaling v. Aetna Insurance Co., 742 A.2d 282, 288 (R.I. 1999)). Absent such proof, a plaintiff's verdict would be based on conjecture and speculation, and in such situations a defendant would be entitled to a judgment as a matter of law. See Schenck, 119 R.I. at 515, 382 A.2d at 517 (citation omitted). Furthermore, it is well-settled in Rhode Island that a plaintiff claiming injury that is due to tort "has a duty to exercise reasonable diligence and ordinary care in attempting to minimize [his or her] damages." Tomaino v. Concord Oil of Newport, Inc.,709 A.2d 1016, 1026 (R.I. 1998).
During trial of this matter, the Court found that the standard of care practiced by institutions similar to St. Aloysius lies beyond the common knowledge of a layperson. Accordingly, the plaintiff attempted to establish a standard of care and deviation therefrom as causing his alleged harm by qualifying Dr. Steven Feldman as an expert in the standard of care practiced by similar institutions. However, upon Dr. Feldman's failure to offer sufficient background and expertise regarding residential child care during the relevant period of time or first hand knowledge of the quality of services provided to plaintiffs, the Court ruled that he lacked sufficient expertise to express opinions about the standards of care in residential placement and that lap-sitting was the cause of plaintiff's molestation. Further, the Court determined that due to a lack of factual foundation, Dr. Feldman was not qualified to render an opinion as a specialist in residential care. Accordingly, upon rejection of plaintiff's offer of proof, no expert testimony was introduced to establish an applicable standard of care or that deviation therefrom proximately caused the plaintiff's alleged injuries.
The plaintiff next argued essentially that the circumstances of the molestation, namely lap-sitting at the time of the assault, as a violation of policy, constituted negligence per se. Evidence before the Court established that St. Aloysius had no notice of Leeder's molestation of its residents prior to Leeder's incident with Eugene. Leeder's touching of others was not done openly; it was clandestine. The assault on Eugene came to light a few weeks after it had occurred, only when St. Aloysius staff were investigating claims made by other boys. The investigation of the allegations against Leeder revealed that some, but not all, of the incidents occurred during lap-sitting. Although Burke testified that lap-sitting was "absolutely prohibited," the plaintiff failed to introduce evidence that lap-sitting violated a policy of St. Aloysius. Further, the Director of St. Aloysius, Robert McIntyre, (McIntyre) testified that lap-sitting was a violation of the facility's practices, not policies. In addition, there is no evidence before this court of any existing industry standard regarding the practice itself during the relevant period of time. Accordingly, the plaintiff has failed to establish the requisite standard of care. Further, even if violation of a policy existed and could be found to constitute negligence, recovery by the plaintiff is barred unless it was the proximate cause of the his harm. See Brodeur v. Desrosiers, 505 A.2d 418, 422 (R.I. 1986) ("[I]f a violation of a statute or ordinance is the proximate cause of injury, evidence of the violation is `prima facie evidence' of negligence"). As previously stated, the plaintiff has failed to establish a standard of care or prove pursuant to expert testimony that the breach of any standard by St. Aloysius proximately caused his alleged injuries, specifically PTSD. Accordingly, the plaintiff has failed to establish the requisite elements of his negligence claim.[4]
Moreover, even if plaintiff's expert did establish a breach of duty by St. Aloysius, the credible and persuasive evidence of causation and harm is insufficient to meet the plaintiff's burden. Most significantly, the plaintiff's own testimony, mottled with selective memory, self-serving statements and unabashed untruths, is not worthy of belief. In addition, his claim regarding the exposure incident is specifically contradicted by evidence of record. Further, the testimony of Ana Lee, Heroux, and Shaw is equally unpersuasive. Ana Lee's proffered familiarity with Eugene and his family life was undermined by her inability to identify the significant male figures in Eugene's life. Further, her pre- and post-St. Aloysius characterizations of Eugene pale in comparison to the persuasive evidence of record. Similarly, the testimony of Heroux during cross-examination, as well as Theriault's testimony, corrected the erroneous documentation which suggested that Eugene had suffered permanent harm as a result of the Leeder incident. Furthermore, Shaw's testimony, besides being inherently biased, is not credible. Finally, in addition to not being accepted as an expert in residential care, Dr. Feldman proffered an opinion based on selective data despite substantial evidence to the contrary. Unlike the testimony of Dr. Penn, his testimony was not compelling. For the foregoing reasons, the plaintiff's negligence claim fails.
 Eugene's Intentional Infliction of Emotional Distress Count against St. Aloysius — Count XI
In this count, Eugene complains that the conduct of St. Aloysius and John Does 1-20[5] in the operation and supervision of St. Aloysius and toward him was outrageous. As a result, the plaintiff contends that he suffered severe emotional distress with physical symptomatology.
Our Supreme Court has articulated the four elements necessary to prove this cause of action which is sometimes referred to as the tort of outrage:
 "1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe."
Swerdlick v. Koch, 721 A.2d 849, 862 (R.I. 1998) (citation omitted). Additionally, "at least some proof of medically established physical symptomatology" is required for a successful intentional infliction of mental distress action. Id. at 863 (citations omitted). "[P]sychic as well as physical injury claims must be supported by competent expert medical opinion regarding origin, existence and causation." Vallinoto v. DiSandro, 688 A.2d 830, 839 (R.I. 1997). (Self-serving uncorroborated statements that plaintiff sustained nightmares, headaches, anxiety, stomach aches, nausea and flashback as the proximate result of her sexual encounters with defendant are insufficient without supporting legally admissible competent medical evidence). Accordingly, the plaintiff may not recover unless he proves that St. Aloysius' extreme and outrageous conduct intentionally or recklessly resulted in causing him severe emotional distress with resulting physical manifestation. See id. at 838.
In the matter before this Court, while Leeder's conduct arguably may have been outrageous, he is not a party to this action. Viewing the evidence in a light most favorable to the plaintiff, there has been no credible evidence that St. Aloysius' conduct was extreme or outrageous. To the contrary, the evidence demonstrates that the management and operation of the facility, as related to Eugene and, in particular, the Leeder incident, were reasonable. Further, although Eugene's expert witness, Dr. Feldman, testified that Eugene's alleged PTSD resulted from the Leeder incident, when addressing the DSM-IV criteria for establishing a diagnosis of PTSD, he conceded that many experiences in plaintiff's history prior to the Leeder incident would qualify as sufficiently traumatic to satisfy the requisite criteria. Absent evidence which fairly tends to show that the alleged injury, PTSD, to plaintiff was the result of outrageous conduct on the part of defendant St. Aloysius, the plaintiff's claim cannot succeed.
In addition, the plaintiff offered no credible evidence of physical symptomatology. Besides his own self-serving testimony, the evidence of record connected physical symptoms such as sleep disturbance to his incarceration at the RITS and his mother's failing health. Finally, even if plaintiff had manifested physical ills, he failed to produce competent medical evidence showing objective physical manifestation of his alleged psychic injuries that proximately resulted to him from St. Aloysius' action. See id. Accordingly, plaintiff's claim for intentional infliction of emotional distress fails.
 Eugene's Assault and Battery Count against McIntyre and John/Jane Doe 11-20 — Count X
In this count, plaintiff Eugene asserts a claim of assault and battery against defendants McIntyre, identified in the amended complaint as Director of St. Aloysius, and John/Jane Doe 11-20. In pertinent part, plaintiff alleges that McIntyre "acted with intent to inflict upon [Eugene] unlawful physical contact, or to cause [him] the apprehension of such unlawful physical contact" and that John Doe 20, the defendant who sexually abused Eugene at St. Aloysius, "engaged in various unlawful and unconsented to physical contacts" with Eugene.
In Rhode Island, "[a]ssault and battery are separate acts, usually arising from the same transaction, each having independent significance." Hennessey v. Pyne, 694 A.2d 691, 695-96 (R.I. 1997) (quoting Picard v. Barry Pontiac-Buick, Inc., 654 A.2d 690, 694 (R.I. 1995)). "`An assault is a physical act of a threatening nature or an offer of corporal injury which puts an individual in reasonable fear of imminent bodily harm.'" Id. at 696 (quoting Picard, 654 A.2d at 694) "It is a plaintiff's apprehension of injury [which apprehension must be of the type normally aroused in the mind of a reasonable person] which renders a defendant's act compensable." Id. (quoting Picard, 654 A.2d at 694). Battery, however, is
 "an act that was intended to cause, and in fact did cause, `an offensive contact with or unconsented touching of or trauma upon the body of another, thereby generally resulting in the consummation of the assault. An intent to injure plaintiff, however, is unnecessary in a situation in which a defendant willfully sets in motion a force that in its ordinary course causes the injury.'" Id. (quoting Picard, 654 A.2d at 694).
Sexual abuse of a child is essentially a common law battery. Kelly v. Marcantonio, 678 A.2d 873, 877 (R.I. 1996).
To the extent that the plaintiff claims McIntyre personally committed the intentional torts of assault and battery on him, plaintiff failed to offer any evidence of any contact whatsoever between himself and McIntyre. Accordingly, judgment must enter in favor of defendant McIntyre and against the plaintiff.
Alternatively, to view this count as against McIntyre in his capacity as Director of St. Aloysius in order to implicate St. Aloysius seems incongruent with the plaintiff's amended complaint which enumerates specific defendant(s) under each cause of action. In particular, for example, count VII of the amended complaint, wherein the plaintiff expressly names both McIntyre and St. Aloysius, demonstrates plaintiff's awareness of a distinction between these defendants. Nevertheless, in light of the rule favoring a broad interpretation of pleadings, the subject count may be construed as a claim against St. Aloysius.
To prevail against St. Aloysius on this count, plaintiff would have to prove that St. Aloysius was vicariously liable for Leeder's alleged act. In Rhode Island, it is well-established that an employer, in the absence of a statute to the contrary, is generally not liable for the intentional tortious conduct of an employee unless the tort was committed while performing a duty in the course of his or her employment and by express or implied authority from the employer. Drake v. Star Market Co., Inc.,526 A.2d 517, 519 (R.I. 1987); Labossiere v. Sousa, 87 R.I. 450,143 A.2d 285 (1958); Bryce v. Jackson Diners Corp., 80 R.I. 327,96 A.2d 637 (1953). In an appropriate case, the law may imply the authority to an employee so as to hold the employer liable even though the act is one specifically forbidden by the employer or is in violation of law. Bryce, 80 R.I. at 331, 96 A.2d at 639. In the absence of unusual circumstances, however, it is difficult to imply authority to commit an assault or to perform a criminal act. Id. at 331, 96 A.2d at 640. Where an employee commits a tort as an incident to the execution of a duty which he or she was hired to perform, however, the necessary authority is implied by law so as to hold the employer liable for the employee's tortious method of performing the duty delegated to him or her, even though the employee's act was willful and unauthorized or forbidden. Id. at 331-32, 96 A.2d at 640. In such circumstances, the wrongful act is held to arise out of and in the course of employment and, unless it is so independent of the reasonable scope of his or her employment as to be the act of the employee alone, the employer may be held to be responsible. Id. at 332, 96 A.2d at 640. In particular, the law implies the authority when the nature of the employee's duty is such that its performance would reasonably put the employer on notice that some force probably may have to be used in executing it. Id. Alternatively, the authority should not be implied where the injury is inflicted by an employee while performing an act that is not reasonably within the scope of his or her employment or authority, express or implied. Id. Moreover, an employer will not be held vicariously liable in punitive damages for an employee's intentional torts unless the plaintiff proves that the employer participated in, authorized or ratified the employee's action. Reccko v. Criss Cadillac Co., Inc., 610 A.2d 542, 545 (R.I. 1992).
The uncontroverted evidence before the Court is that the staff of St. Aloysius had no reason to suspect that Leeder was groping the children. Leeder's misconduct with the plaintiff consisted of a single occurrence. As soon as Leeder's misconduct came to light pursuant to the investigation of allegations initially made by other children, St. Aloysius immediately terminated his employment. Obviously, it was not reasonably within the scope of Leeder's duties to molest the residents of St. Aloysius. Further, the plaintiff failed to present any competent evidence from which the Court could conclude that Leeder was performing an act that was reasonably within the scope of his employment or authority. Moreover, the evidence does not show that Leeder's misconduct was other than Leeder's independent act. Further, the matter herein does not involve the use of force in the execution of Leeder's duties. Based on the foregoing, the plaintiff's claim for assault and battery against McIntyre fails.
 Eugene's 42 U.S.C. § 1983 Count against St. Aloysius — Count I
In count I, the plaintiff alleges that St. Aloysius is liable for violation of his civil rights under § 1983 because, while acting under color of law, its actions and omissions amounted to a reckless, callous and deliberate indifference to his rights and entitlements guaranteed by the Constitution and federal laws. The plaintiff claims that his alleged injuries were the direct result of St. Aloysius' allowing lap-sitting which exposed him to sexual assault. Additionally, the plaintiff asserts that the facility was deliberately indifferent to this known danger.
Section 1983 of Title 42 of the United States Code (§ 1983) provides a remedy for deprivations, under color of state law, of a right secured by the Constitution or federal law. Salisbury v. Stone,518 A.2d 1355, 1360 (R.I. 1986) (citing Lugar v. Edmondson Oil Co.,457 U.S. 922, 924, 102 S.Ct. 2744, 2747, 73 L.Ed.2d 482 (1982)). It is well-settled that neither § 1983 nor the Fourteenth Amendment applies to purely private actions. See Forbes v. Rhode Island Brotherhood of Correctional Officers, 923 F. Supp. 315, 321 (D.R.I. 1996) (citing Rodriguez-Garcia v. Davila, 904 F.2d 90, 95 (1st Cir. 1990)). A viable § 1983 claim must establish two essential elements: "First, the plaintiff must allege and prove that some person or state governmental entity, while acting under color of state law, has deprived him [or her] of a federal right secured by federal law or constitution. Second, the plaintiff must identify the federal right alleged to have been violated." Brunelle v. Town of South Kingstown, 700 A.2d 1075, 1081 (R.I. 1997) (citations omitted). Traditionally, the definition of acting under color of state law "requires that the defendant in a § 1983 action have exercised power `possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" Forbes, 923 F. Supp at 321 (citing West v. Atkins, 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988)). Therefore, the validity of a plaintiff's § 1983 claim initially hinges on a demonstration of either direct or indirect state action. Rodriguez-Garcia, 904 F.2d at 95.
Because St. Aloysius is a private entity, the plaintiff must establish that the "conduct allegedly causing the deprivation of a federal right must be fairly attributable to the State." Lugar, 457 U.S. at 937, 102 S.Ct. at 2753. "[S]tate action may be found if, though only if, there is such a `close nexus between the State and the challenged action' that seemingly private behavior `may be fairly treated as that of the State itself.'" Brentwood Academy v. Tennessee Secondary School Athletic Association, 531 U.S. 288, ___, 121 S.Ct. 924, 930, 148 L.Ed.2d 807 (2001) (citing Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974)). "If a defendant's conduct satisfies the state-action requirement, it is action `under color of state law' for § 1983 purposes." Jackson, 419 U.S at 351 n. 2 (citing Lugar, 457 U.S. at 935, 102 S.Ct. at 2752). Several paradigms have been articulated to show that this nexus exists, including (1) the "public function" test, see Rendell-Baker v. Kohn, 457 U.S. 830, 842, 102 S.Ct. 2764, 2772, 73 L.Ed.2d 418 (1982) (where a private actor is performing activities or services which traditionally have been the exclusive prerogative of the state); (2) the "close nexus" test, see Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974) (where the state can be deemed responsible for the specific conduct of the private actor), and (3) the "symbiotic relationship" test, see Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961) (where interdependence between the state and the private actor is such that they were joint participants in the activity). "What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity." Brentwood Academy, 531 U.S. at ___, 121 S.Ct. at 930. Continuing, the Court observed that, "From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." Id. (citations omitted). In Brentwood Academy, the Court reviewed its previously having held that
 "a challenged activity may be state action when it results from the State's exercise of `coercive power,' Blum, 457 U.S. at 1004, 102 S.Ct. 2777, when the State provides `significant encouragement, either overt or covert,' ibid., or when a private actor operates as a `willful participant in joint activity with the State or its agents,' Lugar, supra, at 941, 102 S.Ct. 2744 (internal quotation marks omitted). [The Court has] treated a nominally private entity as a state actor when it is controlled by an `agency of the State,' Pennsylvania v. Board of Directors of City Trusts of Philadelphia, 353 U.S. 230, 231, 77 S.Ct. 806, 1 L.Ed.2d 660 (1957) (per curiam), when it has been delegated a public function by the State, cf., e.g., West v. Atkins, supra, at 56, 108 S.Ct. 2250; Edmonson v. Leesville Concrete Co, 500 U.S. 614, 627-28, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), when it is `entwined with governmental policies' or when government is `entwined in [its] management or control,' Evans v. Newton, 382 U.S. 296, 299, 301, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966)." Id.
Herein, the initial issue is whether St. Aloysius, a non-profit charitable organization formed to provide foster care and treatment of young boys may be regarded as engaging in state action when its employee sexually assaulted the plaintiff. Relying on Kleczek v. Rhode Island Interscholastic League, Inc., the plaintiff contends that St. Aloysius is so intertwined with the government as to be a state actor pursuant to § 1983. 612 A.2d 734 (R.I. 1992) (based on the facts, statewide athletic association had "sufficient contact with the state" so that its rules and regulations constituted state action).
It is undisputed that St. Aloysius was a non-profit, charitable organization that was regulated by, funded by and under contract with the state. Relying on the symbiotic relationship test enunciated by the United States Supreme Court in Burton, 365 U.S. at 715, this Court, Associate Justice Needham presiding, found sufficient evidence to conclude that St. Aloysius was a state actor. (Tr. at 835). Also, see, e.g., McAdams v. Salem Children's Home, 701 F. Supp. 630, 633-36 (N.D.Ill. 1988).
The second required element of a § 1983 cause of action requires the plaintiff to prove deprivation of a right secured by the Constitution or federal law. To satisfy this second element of a § 1983 claim, a plaintiff must also prove that the defendant's conduct was the cause in fact of the alleged deprivation. Rodriguez-Cirilo v. Garcia, 115 F.3d 50, 52 (1st Cir. 1997) (citation omitted). Causation of damages in a § 1983 action is based on "basic notions of tort causation" and "may be fleshed out with reference to state law tort principles." Id. Although not articulated as such in the amended complaint, the plaintiff essentially argues that this case involves a foster child's substantive due process right to be free from harm at the hands of a foster care institution. Absent controlling caselaw, this Court assumes without deciding that, while placed in the subject state-regulated foster care institution, Eugene had a substantive due process right to personal safety. See, e.g., Meador v. Cabinet for Human Resources, 902 F.2d 474
(6th Cir.), cert. denied, 498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 145 (1990) ("[D]ue process extends the right to be free from the infliction of unnecessary harm to children in state-regulated foster homes.").
A municipality may not be held liable under § 1983 "solely because it employs a tortfeasor." Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997). It is well-settled that a § 1983 action cannot be maintained against a municipality under a respondeat superior theory of liability for acts committed by its employees or agents. Casey v. Newport School Committee,13 F. Supp.2d 242, 245 (D.R.I. 1998) (citing Monell v. Dep't. of Social Services of New York, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978)). This rule has been applied "with equal force to private entity state actors." Forbes, 923 F. Supp. at 324 (citations omitted). An entity can be held vicariously liable "only if the constitutional violation at issue results from a policy . . . or decision officially adopted or promulgated by the [entity's] authorized officers or from an established custom or practice of the [entity]." Casey, 13 F. Supp.2d at 245 (citing Monell, 436 U.S. at 690-91, 98 S.Ct. at 2035-36). "Holding [an entity] liable only if the injury results from an officially sanctioned policy or custom, exempts the [entity] from responsibility for the aberrant and unpredictable behavior of its employees while making it liable for acts and conduct rightly attributable to [it]." Bordanaro v. McLeod, 871 F.2d 1151, 1155 (1st Cir.), cert. denied, 493 U.S. 820, 110 S.Ct. 75, 107 L.Ed.2d 42 (1989).
A private entity can be liable under § 1983 when the execution of its policies or customs causes the plaintiff's alleged constitutional deprivation. Id. (citing Monell, 436 U.S. at 694, 98 S.Ct. at 2037-38). In order for a policy to exist, it must be the result of "a deliberate choice to follow a course of action . . . from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986). "Alternatively, conduct may be held to constitute a custom or practice, even though it was never officially approved by [an appropriate decisionmaker], if it `is so widespread as to have the force of law,'" Casey, 13 F. Supp.2d at 245 (citing Bryan County Comm'rs, 520 U.S. at 404, 117 S.Ct. at 1388), or it is attributable to the [entity]." Roma Construction Co. v. aRusso, 96 F.3d 566, 575 (1st Cir. 1996) (citing Bordanaro, 871 F.2d at 1156). That is, "it must be so well-settled and widespread that the policymaking officials of the [entity] can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." Id. (citing Bordanaro, 871 F.2d at 1156). Constructive knowledge "may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of [their] official responsibilities the [[entity] policymakers] should have known of them." Bordanaro, 871 F.2d at 1157 (citations omitted). However, there must be a "direct causal link" between an [entity's] policy or custom and the alleged constitutional violation. City of Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989). Thus, a plaintiff must also prove that "the custom or practice must have been the cause of and the moving force behind the deprivation of constitutional rights." Roma Construction Co., 96 F.3d at 575 (citing Bordanaro, 871 F.2d at 1156). As recently articulated by the United States Supreme Court,
 "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the entity was the `moving force' behind the alleged injury. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights. . . . Proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." Bryan County Comm'rs, 520 U.S. at 404-05, 117 S.Ct. 1388-89.
Similarly, a plaintiff "seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with `deliberate indifference' as to its known or obvious consequences." Id. at 407, 117 S.Ct. at 1390. Proof of "simple or even heightened negligence will not suffice." Id. Municipal decisionmakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action — the `deliberate indifference' — necessary to trigger municipality liability." Id. The stringent `deliberate indifference' standard requires proof that a state actor "disregarded a known or obvious consequence of his [or her] action." Id. at 410, 117 S.Ct. at 1391. In a foster care context, according to the Fourth Circuit Court of Appeals, "[a] claim of deliberate indifference, unlike one of negligence, implies at a minimum that defendants were plainly placed on notice of a danger and chose to ignore the danger notwithstanding the notice." White by White v. Chambliss, 112 F.3d 731, 737 (4th Cir.), cert. denied, 522 U.S. 913, 118 S.Ct. 296, 139 L.Ed.2d 228 (1997).
Herein, the plaintiff contends that St. Aloysius failed to protect Eugene from harm, in substance, the Leeder incident. The uncontroverted evidence establishes that lap-sitting was not pursuant to St. Aloysius' policies. In addition, there is no evidence of any policy or custom attributable to St. Aloysius that violated the plaintiff's alleged constitutional rights. To the extent that it was Leeder's practice to have boys at St. Aloysius sit on his lap, the evidence fails to establish that McIntyre or St. Aloysius decisionmakers knew of it until the subsequent investigation of allegations began in January, 1992. The testimony at trial, including Burke's testimony that lap-sitting was "dangerous" and even "prohibited," is insufficient to establish actual or constructive knowledge on the part of St. Aloysius decisionmakers prior to the Leeder incident. Further, according to the testimony, upon learning of the allegations against Leeder, McIntyre and the staff of St. Aloysius were astounded; Leeder was immediately terminated. Although Leeder had been employed at St. Aloysius for several years prior to the incident, there is no evidence to establish that St. Aloysius knew or suspected that Leeder was abusive. In addition, there is no evidence that Leeder had previously been accused of or involved in child abuse. Additionally, there is insufficient evidence to prove that the Director of St. Aloysius should have known of Leeder's lap-sitting bent. Further, the plaintiff has failed to establish that any failure to act on the part of St. Aloysius, including staff training or mandated reporting, that amounts to deliberate indifference to or callous disregard of his alleged constitutional rights. Moreover, the plaintiff has failed to establish causation between any alleged action or inaction by St. Aloysius and his claimed deprivation of federal rights.[6] Based on the foregoing, the plaintiff has not met his burden regarding on the part of St. Aloysius any conscious action or inaction which caused the alleged violation of his constitutional rights. Accordingly, the plaintiff's § 1983 claim fails.
 Eugene's Negligence Count against DCYF — Count IV
The plaintiff Eugene contends that DCYF breached its special duty to exercise responsibility for his personal safety and physical, as well as emotional, well-being. The DCYF counters that the plaintiff's claim fails as a matter of law because it does not owe a duty to protect the plaintiff from an unlikely, remote event, or from the criminal acts of a third-party. This defendant further argues that the plaintiff failed to offer sufficient evidence to meet his burden of proof regarding the requisite elements of negligence: the standard of care applicable to DCYF, any breach thereof, or expert testimony establishing a causal relationship between any act or failure to act on the part of DCYF and the plaintiff's alleged injuries. Additionally, the DCYF contends that it is protected from this claim as well as Eugene's negligence claim by absolute and discretionary immunity.
The DCYF is within the executive branch of state government. G.L. 1956 § 42-72-1(a). Its purpose is to promote, safeguard and protect the social well-being of the state's children. G.L. 1956 § 42-72-2. Generally, the public-duty doctrine shields governmental entities such as the DCYF "from tort liability arising out of discretionary governmental actions that by their nature are not ordinarily performed by private persons." See Schultz v. Foster-Glocester Regional School District,755 A.2d 153, 155 (R.I. 2000) (per curiam) (citing Haley v. Town of Lincoln, 611 A.2d 845, 849 (R.I. 1992)). However, Rhode Island caselaw recognizes three exceptions to this immunity enjoyed by state governments. Id. Of the three, the plaintiff relies on the well-established special-duty exception. The special-duty rule provides that a governmental entity will be liable for actions taken in the course of their public functions when
 "the plaintiffs have had some form of prior contact with state officials `who then knowingly embarked on a course of conduct that endangered the plaintiffs, or they have otherwise specifically come within the knowledge of the officials so that the injury to that particularly identified plaintiff can be or should have been foreseen.'" Id. (citing Kuzniar v. Keach, 709 A.2d 1050, 1054 (R.I. 1998)).
In order to prove a special duty, the plaintiff must establish by a preponderance of the evidence that (1) one or more officials had some form of prior contact with or other knowledge about plaintiff or his situation before the alleged negligent act occurred, (2) officials thereafter took some action directed toward plaintiff or his interests or failed to act in some way that was potentially injurious to plaintiff's person or property, and (3) injury to plaintiff or his interests was a reasonably foreseeable consequence of the governmental entity's action or inaction. See Kuzniar, 709 A.2d at 1056. In order for an act to be considered negligent as to a certain defendant, the risk reasonably to be perceived must be within the range of apprehension. See Radigan v. W. J. Halloran Co., 97 R.I. 122, 128, 196 A.2d 160, 163 (1963) (citing Palsgraf v. Long Island Railroad, 248 N.Y. 339, 344, 162 N.E. 99 (1928)). "A defendant may reasonably be held bound to provide against what from usual experience is likely to happen, but not against unusual or unlikely or the remote or slightly probable event." Mercurio v. Burrillville Racing Association,95 R.I. 417, 420, 187 A.2d 665, 667 (1963) (citation omitted).
The indisputable evidence of record, including the testimony of Burke, Shaw and Cuomo, shows that there was no notice, either actual or constructive, to DCYF that Leeder would assault Eugene. The St. Aloysius staff was shocked when the allegations became known. Prior to the investigation of Leeder in January of 1992, there had been no prior complaints or CANTS reports involving Leeder's touching children inappropriately. Upon learning of Leeder's incident with Eugene, DCYF secured evaluation and treatment for Eugene. Moreover, the evidence reflects DCYF's ongoing efforts toward reunification of Eugene with his mother. Over the course of its involvement with Eugene, DCYF arranged counseling and other therapeutic interventions for him, many of which he declined.
In the matter before the Court, the existence of a special duty running from the DCYF to the plaintiff depended upon his establishing the existence of the above-stated duty-triggering circumstances. Kuzniar, 709 A.2d at 1056. Although the record establishes that the DCYF had prior contact with and knowledge about Eugene and his situation before the Leeder incident, this Court finds that the plaintiff has failed to provide sufficient evidence that DCYF failed to act or acted in some way that was potentially injurious to him, and that his alleged injuries were a reasonably foreseeable consequence of the DCYF's action or inaction. There is no persuasive evidence to establish that Leeder's touching was likely or probable. Further, as previously stated the plaintiff's expert did not causally relate Eugene's alleged injures to the Leeder incident. Even if plaintiff had been able to overcome these infirmities, he did not establish damages to a reasonable certainty. Accordingly, plaintiff's negligence claim against DCYF fails.
 Plaintiff Edward
The essence of Edward's claims of negligence against DCYF and St. Aloysius is that during his stay at St. Aloysius, he was inappropriately restrained by St. Aloysius staff. In support thereof, he relies on St. Aloysius' restraint policy as well as his own testimony.
During his testimony, Edward acknowledged that, at the time of the restraint, he was in an argument with another resident when he was pulled from behind. He testified that the physical force used at that time caused injuries to his neck, back, and joints. During cross-examination, however, Edward admitted to having difficulty with anger management. Examples of situations involving his losing his temper include breaking his hand when he punched a wall at St. Aloysius and being disciplined at the RITS for violently assaulting another inmate. Edward admitted that he did not seek medical attention as a result of the subject restraint.
Regarding the physical restraint of residents, St. Aloysius' policy provides that restraints are to occur as a last resort, and only if the client is a danger to himself or others. Exhibit 37.
 Edward's Negligence Counts against DCYF and St. Aloysius — Counts IV and IX
Plaintiff Edward alleges negligence against DCYF and St. Aloysius because the staff at St. Aloysius inappropriately physically restrained him during an incident when he "played dead weight." P. Post-trial Mem., Ex. LL.
One entry in DCYF's record, dated October, 28, 1992, that mentions a restraint of Edward provides:
 "St. Al's S.W. supervised the phone call [between] the boys and mo[ther]. Ed not doing well — Fri was upset (angry) and ran outside — found him in a tree — this weekend he got restrained — he was not following directions — staff had to physically escort him out of the room — Ed than played `dead' `dead weight' had to be restrained for safety reasons —." DCYF Post-trial Mem., Ex. C.
Cuomo testified that she recalled Edward as being a "big and angry kid" who demonstrated some behavioral issues during his placement at St. Aloysius. In particular, when home visits with his mother were disturbed, his behavior worsened. Consequently, he engaged in counseling to address his feelings related to his mother.
The evidence before the Court supports Cuomo's testimony. Regarding Edward's behavior, Dr. Gibbes' psychological assessment in 1993 states in part:
 "Edward presents as having low self-esteem around his capabilities and a great deal of difficulty modulating his emotional expressions functionally, particularly sadness (and anger). Thus he often gets very depressed and hopeless and, at these times, has the propensity to act out aggressively. Over the time that I saw him, he did become more optimistic about being reunited with his mother and some of his depressive dispositions seemed to have subsided. . . . [In summary,] [d]espite the fact that Edward has been out of his mother's care for a number of years, he is still very strongly connected to her psychologically and holds many positive nurturant [sic] memories of her. . . . However, his behavioral characteristics are more in line with a diagnosis of . . . Dysthymia." DCYF Post-trial Mem., Ex. I.
The plaintiff offered no testimony other than his own in support of his negligence claims. Cuomo testified that restraints are necessary at times in order to prevent a child from causing harm to himself or herself or others. Regarding the restraint at issue, no expert testimony was proffered to set forth a standard of care or breach thereof. Edward's admission that he sought no medical treatment as a result of the subject restraint is consistent with the evidence of record which lacks any suggestion to support his allegation that his claimed injuries resulted from the restraint incident. Thus, even if the plaintiff had presented sufficient evidence to meet his burden regarding breach of a standard of care, he failed to offer legally sufficient evidence of causation and damages. Accordingly, this Court finds that the plaintiff has failed to meet his burden relative to his negligence claims against DCYF and St. Aloysius.
Pursuant to the foregoing, this Court need not reach the issues of absolute and discretionary immunity as raised by DCYF.
 Conclusion
Based on the above findings of fact and conclusions of law, this Court finds that the defendant St. Aloysius is not liable to Eugene for negligence, assault and battery, intentional infliction of emotional distress or a violation of 42 U.S.C. § 1983. In addition, St. Aloysius is not liable to Edward for negligence. Further, the State of Rhode Island, Department of Children, Youth and Their Families is not liable to either plaintiff for negligence. Accordingly, the defendants' motions for judgment as a matter of law are granted.
Counsel shall present the appropriate judgment for entry.
[1] The Court refers to the plaintiffs by their first names for purposes of convenience and, in doing so, intends no disrespect.
[2] Pursuant to G.L. 1956 § 14-1-3, the term dependent shall mean:
 "any child who requires the protection and assistance of the court when his or her physical or mental health or welfare is harmed or threatened with harm due to the inability of the parent or guardian, through no fault of the parent or guardian, to provide the child with a minimum degree of care or proper supervision because of (i) The death or illness of the parent; or (ii) The special medical, educational, or social service needs of the child which the parent is unable to provide."
[3] The diagnostic criteria for PTSD, under § 309.81 of the DSM-IV consist of:
 "A. The person has been exposed to a traumatic event in which both of the following were present:
 (1) the person experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others;
 (2) the person's response involved intense fear, helplessness, or horror. Note: In children, this may be expressed instead by disorganized or agitated behavior
 B. The traumatic event is persistently reexperienced in one (or more) of the following ways:
 (1) recurrent and intrusive distressing recollections of the event, including images, thoughts, or perceptions. Note: In young children, repetitive play may occur in which themes or aspects of the trauma are expressed.
 (2) recurrent distressing dreams of the event. Note: In children, there may be frightening dreams without recognizable content.
 (3) acting or feeling as if the traumatic event were recurring (includes a sense of reliving the experience, illusions, hallucinations, and dissociative flashback episodes, including those that occur on awakening or when intoxicated). Note: In young children, trauma-specific reenactment may occur.
 (4) intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event
 (5) physiological reactivity on exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event
 C. Persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness (not present before the trauma), as indicated by three (or more) of the following:
 (1) efforts to avoid thoughts, feelings or conversations associated with the trauma
 (2) efforts to avoid activities, places, or people that arouse recollections of the trauma
 (3) inability to recall an important aspect of the trauma
 (4) markedly diminished interest or participation in significant activities
 (5) feeling of detachment or estrangement from others
 (6) restricted range of affect (e.g., unable to have loving feelings)
 (7) sense of a foreshortened future (e.g., does not expect to have a career, marriage, children or a normal life span)
 D. Persistent symptoms of increased arousal (not present before the trauma), as indicated by two (or more) of the following:
 (1) difficulty falling or staying asleep
 (2) irritability or outbursts of anger
 (3) difficulty concentrating
 (4) hypervigilance
 (5) exaggerated startle response
 E. Duration of the disturbance (symptoms in Criteria B, C and D) is more than 1 month.
 F. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning. Specify if:
 Acute: if duration of symptoms is less than 3 months
 Chronic: if duration of symptoms if 3 months or more
 Specify if:
 With Delayed Onset: if onset is at least 6 months after the stressor." Diagnostic and Statistical Manual of Mental Disorders, Posttraumatic Stress Disorder, § 309.81 at 427-29 (4th ed. 1994).
[4] As noted above, judgment as a matter of law entered in favor of St. Aloysius and against the plaintiff on his claim for negligent hiring, supervision, and retention.
[5] The complaint identifies John/Jane Doe 1-10 as employees of the State or DCYF and John/Jane Doe 11-19 as individuals responsible for hiring, training and supervision of St. Aloysius employees, or responsible for assuring that reports of allegations of neglect or abuse at St. Aloysius were reported as required by law. The defendant John Doe 20, according to the complaint, sexually abused the plaintiff at St. Aloysius. Previously, the Court, Associate Justice Needham presiding, dismissed all counts against John/Jane Does. During oral argument, Eugene's attorney had conceded to Associate Justice Needham that Leeder was a John Doe.
[6] Again, Associate Justice Needham granted judgment as a matter of law in favor of St. Aloysius on plaintiff's count for negligent hiring, training and supervision. Additionally, as discussed herein, plaintiff's negligence and intentional tort claims against St. Aloysius fail.